December 17, 1860.

## SUPREME COURT—IN ADMIRALTY.

### MAKAULA *et als. vs.* THE BRIG "WAILUA."

IN A CASE of culpable rashness in the conduct of the master of a vessel, resulting in hardship and personal suffering to the complainants, (belonging to the crew of said vessel,) as well as a loss of time and breach of the contract of shipment, the owners of the vessel were held responsible in damages, for the acts of the master, as being within the scope of his authority, the same as if the acts had been committed by the owners themselves.

Where, by the fault of the master, a vessel was detained in the Northern Seas, so late as to render it impossible to return to the port where the contract of shipment was made, and whereby the term of service had expired, the Court fixed a date at which the accounts under the contract should be closed, and decreed that a *quantum meruit* should be paid to the libellants for the ensuing period of service, forming a reasonable extra allowance, to be based upon the shares they were to receive during the first term of service.

Where a charge is based upon a usage, the usage must be satisfactorily proven, before it can be allowed.

Before Justice ROBERTSON :

This is a libel *in rem,* filed by Makaula and eight others, native Hawaiian seamen, against the whaling brig " Wailua," Lass master, of Honolulu. The libel sets forth, in substance, that the libellants shipped as seamen on board the " Wailua," about the 30th of December, 1858, for a whaling and trading voyage, not to exceed twelve months, and were each to receive the 140th lay or share of the proceeds derived from such whaling and trading ; that the master voluntarily and willfully, not being compelled thereto by any casualty, carried the vessel into Plover Bay, in the Fall of 1859, and made preparations to remain there during the winter, in violation of the shipping agreement ; that the vessel was frozen in in November, 1859, and remained so till the month of June, 1860, by which the libellants, who were unused to the rigors of a Northern winter, suffered great hardship, through which four of them were badly frostbitten in their feet and legs, and five of their number were severely affected with scurvy ; that during the stay of the vessel in Plover Bay, six of their companions died from the effects of privation and cold, or of complaints thereby induced ; that the amount of oil taken during the whole voyage they believe to be 650 barrels, of which they claim their share, and likewise damages for their loss of time and unnecessary suffering.

Messrs. E. Hoffschlaeger and F. Stapenhorst, part owners and agents of the vessel, appeared as claimants, and filed an answer to the libel. The answer denies that any agreement was made to pay the libellants a share of the proceeds of trading ; admits that the vessel was frozen in, and remained at Plover Bay from November, 1859, till June, 1860, but avers that Captain Lass did not remain there voluntarily or from design, but by stress of weather, the unfortunate situation and condition of his crew

disabling the vessel, and through the sudden and unexpected freezing up of the Bay, where the vessel was lying engaged in whaling ; that the oil not having been gauged, the claimants are ignorant of the exact quantity procured, but believe it to be about 450 barrels for the voyage, 280 barrels for the first season, and 170 barrels the second, and state the quantity of bone to be 7,029 pounds; and that the libellants are all indebted to the vessel over and above the amount of their shares.

A large amount of evidence has been put in on both sides, and much of it is conflicting, as is usual in such cases, requiring to be carefully weighed by the light of surrounding circumstances. The main issue in the case is raised by the allegation that Captain Lass willfully and intentionally wintered his vessel in Plover Bay, which is positively denied. It appears that the "Wailua" left the Arctic Ocean and passed southward, through Behring Straits, in September, 1859, and on the 20th of that month entered Plover Bay, on the coast of Asia, for the purpose, as Captan Lass testifies, of obtaining water for the passage to these Islands. When the "Wailua" entered Plover Bay the American bark "Cleone," Captain Simmons, was already anchored there, for the purpose of whaling as long as the season would permit, and of remaining over through the winter. It was endeavored to be shown, on the part of the libellants, that Captain Lass had formed the design of remaining in Plover Bay for the winter before he entered the Bay, or if not before, that he did so soon after his arrival there, at the instigation of, and upon consultation with, Captain Simmons, of the "Cleone," and immediately commenced making arrangements for that purpose by sending on shore casks and a portion of the vessel's spars, and doing certain things which clearly indicated a design to winter in the Bay. Some testimony was given also of conversations said to have occurred between the two masters, indicating a plan to that effect, and an understanding between them that, if Captain Lass would remain through the winter, Captain Simmons would assist him with supplies. On the other hand, Captain Lass testified upon oath that he never intended to remain through the winter; that to have done so would have been a violation of his orders; that he knew he was under an obligation to return the native seamen at the

time agreed upon, and that his vessel was not fitted with provisions and other necessaries for such purpose. He states that he went to Plover Bay to obtain water, and after he arrived there, having been informed that whales frequented the Bay late in the season, he determined, with the approval of his officers, to remain as late as possible to procure oil, and obtained some supplies from Captain Simmons for that object. He states, also, that the arrangements he made, in respect to the vessel, were only such as were consistent with his intention to remain for a time whaling in the Bay, and that he sent the empty casks on shore to prevent the noise incident to their being coopered on the vessel's deck, which the Indians said would frighten the whales entering the Bay. Captain Lass' statements are strongly corroborated by the testimony of Captain Simmons, and of Mr. Williams, an officer on board of the "Wailua." As to the inferences to be drawn from the conduct of Captain Lass, after arriving in Plover Bay, in the disposition of his vessel, and his continuing to remain there after the indications of impending winter had appeared, the Court has had the aid of very valuable testimony. In no Court in the world could the testimony of men more competent to speak on the subject be produced. Captain Long, Captain Kelly and Captain Fish, who have given their evidence in this cause, are men of skill, long experience, and high reputation in their profession, giving to their statements the greatest weight on a question of this sort; albeit their testimony was given with a certain degree of *l'esprit du corps.*

After mature consideration of the evidence, I am of the opinion that it is not proven, as alleged in the libel, that Capt. Lass remained with his vessel in Plover Bay through the winter from previous design. Although such is the allegation of the libel, and the evidence does not, in my opinion, sustain it, I shall not dismiss the libel on that ground, because the defect in the libel would be cured by amending it, and inserting therein an alternative allegation charging recklessness, which would be sustained by the proofs given; an amendment which would no doubt have been allowed upon an appeal to the full Court. (Conkling's Admiralty, page 607.) The evidence does show satisfactorily that he acted imprudently and recklessly when he

remained in Plover Bay, in the 64th degree of North latitude, so late as the 20th of November, after ice had repeatedly formed in the Bay, and with his vessel unprepared to go to sea. His conduct in this respect amounted to culpable rashness, and was the cause of the hardship, suffering, and loss of time which ensued, as well as a breach of the contract of shipment with the libellants, for the damages resulting from which the owners are liable, it having been committed by the master in the discharge of his functions as such. . (Rights and Duties of Mer. Seamen, pp. 195, 199, 328, 339 ; Abbott on Shipping, 5th Am. Ed., pp. 156, 170 ; Pritchard's Ad. Digest, p. 222, Sec. 8, Note 4.) The owners are responsible for the acts and errors of judgment of the master within the scope of his authority, and in respect to the conduct of the ship, the same as if committed by the owners themselves. (The "Vibilia," 1 W. Rob., 15 ; Ellis *vs.* Turner, 8 Term. R., 531 ; The "Vrouw Judith," 1 C. Rob., 151 ; The "Columbia," 1 C. Rob., 156.)

It appears that on or about the 20th November; 1859, while three of the "Wailua's" boats were out engaged in whaling, a severe storm came on, breaking up the thin ice then formed in the Bay, and preventing the boats from regaining the ship. In that storm, the chief mate and one or two seamen were lost ; the crews of the boats suffered intensely from cold and wet ; some of them succeeded with great difficulty in reaching an Indian camp on the shore, and it was several days before all the survivors regained the vessel. It was then apparent, from the disabled condition of the crew, the unprepared state of the vessel, and the unfavorable state of the weather, that the "Wailua" must remain in the Bay for the winter, and dispositions were made accordingly, by housing her in, etc. The cruise for which the libellants had shipped under articles, must be held to have terminated at that time. I shall therefore decree that the accounts under the contract of shipment be closed at the 20th November, 1859 ; that the advances which the libellants had received, with interest thereon up to that date, shall be charged against the earnings that had accrued to them up to that time, at the 140th share of the catchings, and that the balance, if any, due to each at that date, be placed to his credit.

It appears that the vessel remained shut up by the ice in Plover Bay until the 10th of July, 1860, at which date she was anchored outside the bay, and ready to proceed North for the second cruise. From the time the "Wailua" lost her chief officer and became shut in, till the summer of 1860, when she received supplies of fresh provisions from vessels arriving from Honolulu, was a time of severe hardship and privation for the libellants and their companions, particularly the Hawaiian seamen, several of whom sank under it. At the time of the storm in November, and through the winter, Capt. Lass, to his credit be it said, treated the libellants kindly, and did all that the limited means at his command permitted to mitigate their condition. In consideration of their detention and privations, I shall decree the libellants the sum of one hundred dollars each, and cannot allow any charge to be made against them for clothing and other necessaries furnished to them between the 20th of November, 1859, and the 10th of July, 1860, at which date their accounts will be opened for the second season.

During the vessel's second cruise in the Arctic Ocean, in respect of which there was no express contract with the libellants as to wages, it appears that the "Wailua" was able to man for whaling only two boats instead of four, which was the number she could man when she sailed from Honolulu. It was contended, therefore, and with reason, that as the libellants were not under a contract for the second season, they must be paid a *quantum meruit ;* the amount of which should be ascertained by an average of the catchings of the vessels which whaled in the Arctic Ocean during the season of 1860. In my opinion that would not be a fair method of ascertaining the amount to be paid the libellants, and I consider it more just towards the owners to allow the libellants, in addition to the 140th share, for which they served during the first season, and which forms a fair basis of calculation, such a reasonable extra allowance as shall, in the estimation of the Court, meet the difference which existed in the vessel's capacity for whaling between her first and second seasons. Having adopted this as the proper basis for ascertaining the amount which the libellants should receive, it does not follow, everything being considered, that a vessel which is able, efficiently and continuously, to man two boats on

the whaling ground, will procure only half as much oil as a ves-
sel which is able to man four boats when she leaves port, sup-
posing their chances to be equal.    I shall therefore decree the
libellants to receive for their services during the second sea-
son, the 140th share of the oil and bone, with 50 per cent. added,
as a *quantum meruit.*

The quantity of oil obtained during the entire voyage, accord-
ing to the certified statement furnished by the claimants, is 593
barrels, which, in the absence of any positive proof as to the
quantity obtained during each season separately, will be divided
between the two seasons, in the proportions indicated by the
answer, thus : 350 barrels for the first season, and 243 barrels
for the second season.    The quantity of bone procured is 7,029
pounds, which will be divided thus : 4,148 pounds for the first
season, and 2,881 pounds for the second season.

There appears, printed on the margin of the shipping articles,
a note to the effect that the libellants and others of the crew,
were to be paid off at what are known here as "the United
States Consular prices."    Those are the rates for oil and bone at
which seamen belonging to American ships are paid off here
from season to season.    It was argued by counsel for the libel-
lants that, as the memorandum is printed only in the English
language, and on the margin of the document, it was probably
not understood by the libellants, and should not bind them.
But the libellants having been shipped in the presence of an
officer appointed by the Government, whose duty it is by law
to assist the native seamen in making their contracts, and to
protect them in their rights, I must presume that the officer did
his duty in this instance, and explained the shipping contract
to the libellants, in all its parts.    Their shares will therefore
be calculated at the " Consular prices," for the present season,
as they have been given in evidence.

There is a charge made against each of the libellants of six
days' wages after the return of the vessel to Honolulu, on the
ground, as it is said, of a usage existing here, that seamen re-
main by their vessels for eight days after their arrival in port.
The existence of such a usage is not satisfactorily proven, and
the charge is therefore not allowed.

Finally, it is not proven that any agreement was made to pay

these libellants any share of the proceeds of the trading, and they can recover none.

An order of reference will be made, authorizing J. W. Austin, Esq., to compute the amount due to the several libellants, allowing the proper credits, and upon the coming in and approval of his report, a decree will be entered accordingly.

Mr. Harris, for the libellants.

Mr. Austin and Mr. Montgomery, for the claimants.